1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SAMUEL WINDHAM, JR.,

11              Plaintiff,                    No. CIV S 05-0954 GEB GGH  P

12        vs.

13
     CALIFORNIA DEPARTMENT OF
14   CORRECTIONS, et al.,

15              Defendants,                   FINDINGS AND RECOMMENDATIONS

16   _____/

17   I.  Introduction

18              Plaintiff, a state prisoner proceeding with appointed counsel, seeks relief pursuant

19   to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment,

20   filed on June 23, 2008, to which plaintiff filed his opposition on October 27, 2008; defendants'

21   reply was filed on November 6, 2008.

22   II.  Complaint

23              This case is proceeding on an amended complaint, filed on November 28, 2005.[1]

24   Plaintiff names ten (10) defendants who were employed at either California Medical Facility -

25   _____

26        [1] The original complaint was filed on May 16, 2005.

Vacaville (CMF) or at California State Prison Solano (CSP-Solano): Dr. M. Zhu; Sergeant (Sgt.) Wilkerson; Correctional Officer (C/O) Powe[2]; C/O Moore; C/O Andrada; Dr. Traquina; Captain (Capt.) Garcia; C/O Evans; Lieutenant (Lt.) Pulsipher; Sgt. Ruiz.  Amended Complaint (AC) at 1-2.

Plaintiff states that he is a burn victim with full body skin grafts covering 75 to 80 percent of his body.  AC at 2-3.  Previously, plaintiff was assigned as a disabled worker coordinator at CMF, and was warned by inmates who were his friends that two other inmates wanted to get plaintiff disciplined because he had not helped them make a bed move.  AC at 5. Plaintiff did not have the authority to do what they wanted, but the two inmates apparently blamed him for the move and became vindictive toward him.  Id.  One night, plaintiff's housing officer C/O Kelly (not a defendant), in passing out the mail, delivered an envelope to plaintiff containing a few dollars but no return address.  Id.  Plaintiff turned over the money either to his supervisor, K. Caravello (not a defendant) or to defendant Pulsipher, the unit supervisor because plaintiff did not know where the money came from and wanted CMF to find out the source.  Id.

While waiting for defendant Evans of the Security Investigation Unit (S&I) to investigate the matter, plaintiff received more money orders also for small amounts, which plaintiff again turned over to C/O Kelly, thinking it was the work of the two disgruntled inmates. AC at 6.  Plaintiff and C/O Kelly went to Caravello who notified defendants Garcia, Pulsipher, Ruiz and Evans.  Defendant S&I Officer Evans was told by Caravello and Kelly that plaintiff did not know where the money was coming from.  Id.  After a few months, defendant Evans called plaintiff into Caravello's office and told him the matter had been investigated, plaintiff was in the clear, and not to worry about it.  Id.

Around a year later, on the morning of December 18, 2003, defendant Powe, who knew of plaintiff's medical condition, approached plaintiff and told him to stand, searched,

---

[2] C/O Powe is erroneously referred to in some pleadings and on the court docket as "Poe".

1   grabbed and cuffed him on his skin grafts, causing the grafts to twist, with no explanation.  AC at

2   3, 6.  Defendant Powe escorted plaintiff to a holding cell.  AC at 6-7.  Defendant Moore then

3   placed handcuffs on plaintiff's grafts more tightly.  AC at 3.  Plaintiff was later taken and locked

4   into a holding cell in Receiving and Release (R&R) by defendant Wilkerson.  Id.  Defendant

5   Wilkerson was also involved in throwing away plaintiff's medical supplies.  AC at 3.  Defendant

6   Andrada participated in throwing plaintiff's medical supplies away as well.  Id

7        Plaintiff was then taken to CSP-Solano.  AC at 7.  The metal restraints were still

8   placed directly onto plaintiff's skin grafts and without his leg support jobskin stockings[3] on his

9   legs, the restraints began to tear and irritate the graft sites.  Id.  Once plaintiff was escorted to

10  CSP-Solano's holding cell in R&R, all metal restraints were removed from plaintiff's waist,

11  wrist and ankles; at that time, plaintiff felt and observed that the restraints had begun to break

12  down the skin grafts between his legs, lower ankles and upper thighs.  AC at 8.

13       CSP-Solano's R&R Officer Webb (not a defendant) cuffed plaintiff and took him

14  to the medical station for an examination.  AC at 8.  Plaintiff informed the nurse, not a defendant,

15  that more than 75 percent of his body was covered with skin grafts, that he needed jobskin

16  stockings and other medical items to keep his grafts medically stable.  Id.  Plaintiff was then

17  taken to a holding cell and placed in metal restraints that were directly on his unprotected burn

18  grafts.  Plaintiff had no medical supplies to reduce leg pressure and was unable to provide

19  himself the daily treatment for his burn-grafted skin and donor sites.  AC at 9.  It was not until

20  later that plaintiff learned he was being investigated for extorting elderly inmates at CMF, after

21  an inmate filed a complaint.

22       Even though defendants Garcia, Pulsipher, Evans and Ruiz were fully aware of

23  what had happened with regard to plaintiff's receipt of the envelopes with money, they did

24

25       [3] Plaintiff describes these as a special type of custom fit support hose that act as second
    skin to protect burned areas during the healing process and keep skin grafts from deteriorating.
26  Pl. Dec., at ¶ 6.

1  nothing on plaintiff's behalf at any of the Institutional Classification Committee (ICC) hearings.

2  AC at 3-5.  Plaintiff claims he was illegally transferred to another institution without any prior

3  notification or hearing in violation of his due process rights.  AC at 9.  Plaintiff was denied his

4  medical supplies after CSP-Solano's Dr. Noriega (not a defendant) ordered them and was thereby

5  forced to clean and stop the bleeding with his own urine.  AC at 10.  Plaintiff claims this to be a

6  violation of the transfer of inmate procedure outlined in Department Operations Manual (DOM)

7  at sections 54046.18 & 54046.18.3.  Plaintiff was basically bed-ridden and in pain because he

8  was without his medical supplies and adequate care.  Id.

9          Plaintiff alleges as to defendant Dr. Zhu, that she cleared plaintiff to be housed in

10  administrative segregation in another prison of which she knew nothing and did nothing to help

11  plaintiff even though she knew he was bleeding while attending two ICC hearings on December,

12  24, 2003, and April 2, 2004.  AC at 3.  Defendant Traquina, the Chief Medical Officer (CMO),

13  was well aware of plaintiff's serious medical condition, but ignored plaintiff's injuries, which led

14  to numerous wounds and exacerbated the previous burn sites.  AC at 4.

15          In addition to the alleged due process violations, plaintiff accuses the defendants

16  of conspiring to keep him in administrative segregation.  AC at 10-11.  He claims the actions of

17  defendants were malicious, oppressive and caused him mental and emotional pain.  AC at 11.

18  He seeks money damages in the form of compensatory and punitive damages for the severe pain

19  and being kept in a facility inadequate for his medical condition.  AC at 12.

20  III.  Motion for Summary Judgment

21          Defendants move for summary judgment on the ground that plaintiff is not

22  entitled to the relief requested as to any material fact and the moving party is entitled to judgment

23  as a matter of law.  Motion for Summary Judgment (MSJ), at 4.

24          Legal Standard for Summary Judgment

25          Summary judgment is appropriate when it is demonstrated that the standard set

26  forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

4

1   there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

2   as a matter of law."  Fed. R. Civ. P. 56(c).

3           Under summary judgment practice, the moving party

4           always bears the initial responsibility of informing the district court
        of the basis for its motion, and identifying those portions of "the

5           pleadings, depositions, answers to interrogatories, and admissions
        on file, together with the affidavits, if any," which it believes

6           demonstrate the absence of a genuine issue of material fact.

7   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

8   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

9   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

10   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

11   after adequate time for discovery and upon motion, against a party who fails to make a showing

12   sufficient to establish the existence of an element essential to that party's case, and on which that

13   party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

14   failure of proof concerning an essential element of the nonmoving party's case necessarily

15   renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

16   granted, "so long as whatever is before the district court demonstrates that the standard for entry

17   of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

18           If the moving party meets its initial responsibility, the burden then shifts to the

19   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

20   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

21   (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

22   not rely upon the allegations or denials of its pleadings but is required to tender evidence of

23   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

24   contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

25   106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

26   material, i.e., a fact that might affect the outcome of the suit under the governing law, see

1  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

2  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

3  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

4  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

5        In the endeavor to establish the existence of a factual dispute, the opposing party

6  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

7  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

8  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

9  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

10  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

11  56(e) advisory committee's note on 1963 amendments).

12        In resolving the summary judgment motion, the court examines the pleadings,

13  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

14  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

15  477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

16  placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

17  at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

18  opposing party's obligation to produce a factual predicate from which the inference may be

19  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

20  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

21  party "must do more than simply show that there is some metaphysical doubt as to the material

22  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

23  nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct.

24  1356 (citation omitted).

25  \\\\\

26  \\\\\

IV.  Undisputed Facts

    The following of defendants' undisputed facts (DUF) are either not disputed by plaintiff, or following the court's review of the evidence submitted, have been deemed undisputed.  Plaintiff was an inmate at CMF and CSP-Solano.  DUF #1.  Plaintiff has burn scar injuries to his wrists, abdomen, both thighs and lower legs.  DUF #28.  On October 4, 2001,  C/O Kelly attempted to deliver mail to plaintiff.  The envelope was stamped, "No letter enclosed, $25.00 money order only."  DUF #2.  Plaintiff requested that the money be returned as he did not know where the money was from.  Id.  On February 21, 2002, plaintiff again received a money order, this time for $12.00, but plaintiff did not know where it was from and did not accept it.  DUF #4.

    On December 18, 2003, the Investigative Service Unit (ISU) at CMF received a complaint that plaintiff was embezzling funds from other inmates' accounts.  DUF #6.  Later that morning, C/O Powe went to plaintiff's prison office and placed metal handcuffs on plaintiff's burn areas and wrist shunt.  Declaration of Plaintiff (Pl. Dec.), at ¶ 10.  Later, C/O Moore placed waist and leg restraints on plaintiff and the metal made direct contact with plaintiff's skin.[4]  Pl. Dec., at ¶ 11.  Plaintiff did not complain of any pain from the restraints to C/O's Powe or Moore.  P's Depo at 58.  Plaintiff had no chronos that restricted the use of metal restraints.  P's depo 49.  Plaintiff was then transferred into administrative segregation in CSP-Solano, pending the investigation.  DUF #9.  It was only when plaintiff arrived at CSP-Solano in the afternoon of December 18, 2003, that he stated the metal restrains were causing pain.  Depo at 58.

    Within ten days of placement into administrative segregation an inmate has an ICC hearing to review whether the inmate is properly housed in administrative segregation.  DUF #10.  An ICC hearing was held on December 24, 2003, at CSP-Solano.  DUF #11.  Dr. Zhu was present at the hearing and this was plaintiff's first contact with Dr. Zhu.  Pl. Dec., at ¶ 20.  It was

---

[4] Plaintiff states in his deposition that Moore only checked that his restraints were properly attached.  Depo 61.

1   ruled that plaintiff would remain in administrative segregation for ninety days pending

2   competition of the investigation.  DUF #12.

3          During plaintiff's incarceration at CSP-Solano, C/O Andrada who is supervised

4   by Sgt. Wilkerson threw away plaintiff's medical supplies that included ointment, bandages and

5   jobskin supports.

6          On December 19, 2003, plaintiff was seen by Dr. Noreiga who ordered TED

7   hose[5], A&D ointment and Tegaderm to cover his scars.  DUF #30.  On December 29, 2003,

8   plaintiff was seen by Dr. Thor who noted that plaintiff had old open burns on his legs dating back

9   to 1982, and that the burns were open again.  DUF #31.  Dr. Thor ordered Tegaderm, silver

10  sulfadine and TED hose.[6]  Id.  On January 8, 2004, Dr. Noreiga treated plaintiff and noted that

11  plaintiff had multiple epidermal excoriation, but no infection and prescribed Silvadene cream,

12  Tegaderm and Tylenol.  DUF #32.  On January 12, 2004, Dr. Noreiga prescribed Telfa and

13  Silvadene and a different wrap to cover plaintiff's lower extremities, noting that Tegaderm was

14  sticking to plaintiff's grafted skin.  DUF #33.  Plaintiff was also seen by doctors from CSP-

15  Solano, on March 1, 2004 and then admitted into the acute clinic for wound care on March 26,

16  2004.  DUF #34, 35.  Additionally, on June 2, 2004, plaintiff was referred to Dr. McGrath, a

17  professor of Surgery and Plastic Surgery at the University of California, San Francisco.  DUF

18  #38.

19         Plaintiff was returned to CMF on March 26, 2004.  DUF #13.  On April 2, 2004,

20  an ICC hearing was held to review plaintiff's placement in administrative segregation at CMF.

21  DUF #14.  Dr. Zhu was present at this hearing.  Id.  The committee noted that plaintiff had been

22  returned to CMF at the conclusion of the investigation pursuant to a request from Counselor May

23

24         [5] Plaintiff describes these as similar to lady's stockings for varicose veins but they only
    reach to the knee and his burn wounds extend much higher.  Pl. Dec., at ¶ 18.

25

26         [6] Plaintiff states that jobskin stockings were ordered instead of TED hose.  Plaintiff states
    that jobskin stockings are preferable to the TED hose.

1  concerning plaintiff's medical condition.  DUF #17.  Plaintiff was kept in administrative

2  segregation at CMF.  DUF #18.  On August 13, 2004, plaintiff was present at another ICC

3  hearing.  DUF #21.  Following the hearing, plaintiff was released from administrative

4  segregation back to the general population.  DUF #23.

5  V.  Disputed Facts

6          Defendants state that on plaintiff's December 18, 2003, arrival at CSP-Solano, a

7  nurse noted on an intake sheet that plaintiff did not indicate any pain or discomfort with his

8  wrists and there were no new injuries to his wrists just the old scarring on his left arm.  DUF #29.

9          Plaintiff disputes these facts and asserts that his burns started bleeding during the

10 transfer and he informed the nurse.  PUF #29.

11         Defendants stated that Dr. Zhu's sole purpose at the December 24, 2003, ICC

12 hearing, was to ascertain whether plaintiff could understand the proceedings.  DUF #11.  Dr. Zhu

13 asked plaintiff if there were any medical or psychiatric problems that would prevent plaintiff

14 from understanding the proceeding and he indicated there were none.  Id.

15         Plaintiff disputes this, and states that Dr. Zhu's role was to examine and treat him.

16 P's Decl. 20.  Plaintiff states he told Dr. Zhu that he was bleeding severely and begged for help,

17 but Dr. Zhu told the committee that plaintiff had ongoing problems and the ICC hearing was not

18 the forum to treat him.  P's Decl 20.

19 VI.  Eighth Amendment Claims

20         Plaintiff alleges that under the Eighth Amendment, all defendants were

21 deliberately indifferent to his serious medical needs in the treatment of plaintiff's condition and

22 in his transfer to CSP-Solano.  Defendants' actions, while at times clearly negligent, do not meet

23 the stringent standard of deliberate indifference.

24              Legal Standard for Eighth Amendment Claim

25         In order to state a § 1983 claim for violation of the Eighth Amendment based on

26 inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at 1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk is obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at 1981.  However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant."  McGuckin, 974 F.2d at 1061.

\\\\\

1         Superimposed on these Eighth Amendment standards is the fact that in cases

2   involving complex medical issues where plaintiff contests the type of treatment he received,

3   expert opinion will almost always be necessary to establish the necessary level of deliberate

4   indifference.  <u>Hutchinson v. United States</u>, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

5   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

6   treatment he received equated with deliberate indifference thereby creating a material issue of

7   fact, summary judgment should be entered for defendants.  The dispositive question on this

8   summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment

9   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

10  criminally reckless.

11        A.  <u>Dr. Zhu</u>

12        Plaintiff alleges that Dr. Zhu was deliberately indifferent to his serious medical

13  condition during various ICC  hearings and for failing to transfer plaintiff out of  CSP-Solano.

14        It is undisputed and this court finds that plaintiff's condition and the ongoing

15  treatment for his burns and skin grafts are properly characterized as a serious medical condition

16  under the Eighth Amendment.  Plaintiff's injuries significantly affect his daily activities and a

17  reasonable doctor would find his injuries worthy of treatment.  The issue remains if Dr. Zhu was

18  deliberately indifferent in her treatment of plaintiff.

19        Dr. Zhu was present at two of plaintiff's ICC hearings that involve the instant

20  case: the December 24, 2003, hearing (December) and an April 2, 2004, hearing (April).  A

21  review of plaintiff's somewhat confused pleadings reveals that plaintiff only argues that Dr. Zhu

22  violated his rights during the December hearing.  Depo. 30-32.  Plaintiff states that Dr. Zhu did

23  not violate his rights at the April hearing.  Depo 30.  Plaintiff provides facts of the April hearing,

24  \\\\\

25  \\\\\

26  \\\\\

1    because he feels Dr. Zhu's actions at this hearing affect the credibility of her statements regarding

2    the December hearing.[7]

3           Plaintiff had no contact with Dr. Zhu until the December ICC hearing.  Pl. Dec., at

4    ¶ 20.  Plaintiff contends that his wounds were bleeding severely during the December hearing

5    and Dr. Zhu refused to treat him at the hearing.  Id.  Plaintiff states that Dr. Zhu instructed him to

6    fill out a sick call slip, yet Dr. Zhu did not provide plaintiff with the slip.  Id.  Plaintiff alleges

7    that Dr. Zhu had actual knowledge of his medical condition but failed to ensure that he promptly

8    received medical attention.  Opposition (Opp.) at 8.  Dr. Zhu argues that her responsibility at the

9    ICC hearing is only to ascertain if plaintiff was medically and psychiatrically able to understand

10   the proceedings.  Dr. Zhu Declaration (Zhu Decl.), at ¶ 2.  Dr. Zhu also states that plaintiff never

11   stated that he was bleeding.  Zhu Dec., at ¶ 3.

12          Even drawing all reasonable inferences in favor of plaintiff, Dr. Zhu's actions

13   cannot be construed as deliberately indifferent.  It is undisputed that plaintiff's first contact with

14   Dr. Zhu was at the December hearing.  Dr. Zhu worked at CMF and was only at CSP-Solano for

15   the ICC hearing.  The parties dispute Dr. Zhu's responsibilities at the December hearing.

16   Assuming that Dr. Zhu was required to treat plaintiff at the hearing and refused, her actions were

17   not deliberately indifferent to plaintiff's medical needs.  Following the hearing, plaintiff

18   remained at CSP-Solano where his medical condition was being treated, and it was not

19   deliberately indifferent for Dr. Zhu to leave plaintiff's medical treatment in the hands of other

20   physicians.  Immediately following the hearing, plaintiff requested medical help from a

21   correctional officer and a psych tech visited plaintiff.  Plaintiff alleges that the psych tech only

22   shined a light at plaintiff and did not offer any medical treatment.  The failure to treat plaintiff

23

24          [7] Plaintiff states that Dr. Zhu stated she would treat him a few days after the April
     hearing.  Plaintiff states that another doctor treated him and the evidence is disputed if Dr. Zhu
25   ever checked on plaintiff.  Plaintiff does not challenge the treatment he received from the other
     doctor, rather plaintiff argues it was improper for Dr. Zhu to promise to treat him and then have
26   another doctor attend to him.

1  that evening cannot be attributed to Dr. Zhu nor can the delay in treatment at the ICC hearing

2  state a claim of deliberate medical indifference.  Shapley, 766 F.2d 404, 408 (9th Cir. 1985).

3  Plaintiff's unsupported assertions that Dr. Zhu is not credible in her version of events does not

4  suffice to defeat summary judgment.  Leer v. Murphy, 844 F. 2d 628, 634 (9th Cir. 1988)

5  (conclusory allegations insufficient to defeat summary judgment).

6          Furthermore, it is undisputed that plaintiff was receiving treatment while at CSP-

7  Solano, both before and after his interaction with Dr. Zhu at the December hearing.  On

8  December 19, 2003, one day after being transferred to CSP-Solano, plaintiff was seen by Dr.

9  Noreiga who ordered TED hose, A&D ointment and Tegaderm for plaintiff's burns.  DUF #30.

10 Plaintiff does not dispute this, rather disagrees with the treatment and states he should have

11 received jobskin stockings.  On December 29, 2003, Dr. Thor treated plaintiff and ordered

12 Tegaderm, silver sulfadine, and jobskin stockings.  Plaintiff was seen again on January 8th and

13 January 12, 2004, by Doctor Noreiga who prescribed Telfa and Silvadene.  DUF #32, 33.

14 Plaintiff was also seen by doctors from CSP-Solano, on March 1, 2004 then admitted into the

15 acute clinic for wound care on March 26, 2004.  Additionally, on June 2, 2004, plaintiff was

16 referred to Dr. McGrath, a professor of Surgery and Plastic Surgery at the University of

17 California, San Francisco.  DUF #38.

18         Plaintiff has failed to set forth facts demonstrating Dr. Zhu's deliberate

19 indifference at the December hearing or in not transferring plaintiff back to CMF.  Dr. Zhu first

20 met plaintiff at the December hearing and is not alleged to be responsible for plaintiff's transfer.

21 It has been shown that plaintiff was receiving treatment at CSP-Solano following the December

22 hearing, and plaintiff's difference of opinion concerning the appropriate treatment cannot be the

23 basis of an Eighth Amendment violation.  Jackson, 90 F.3d 330 (9th Cir. 1996).

24         Plaintiff has offered no expert testimony that the treatment he received at CSP-

25 Solano was inadequate or deliberately indifferent to his medical needs.  Plaintiff argues that

26 because his condition worsened at CSP-Solano then the treatment was *per se* inadequate.

1    Plaintiff's reliance on *res ipsa loquitur* is misplaced.  These conclusory claims without support

2    are insufficient.  Without expert testimony this court cannot conclude that the treatment at CSP-

3    Solano was inadequate and Dr. Zhu should have transferred plaintiff to CMF (assuming that she

4    could).  Plaintiff alleges that CSP-Solano provided him with TED hose, which are inadequate

5    and he should have received jobskin stockings.  This court cannot speak to the difference of these

6    medical supplies or which antibiotic cream is better for serious burns.  The deterioration of

7    plaintiff's treatment cannot be deemed the result of deliberate indifference on behalf of Dr. Zhu

8    and her failure to treat him at the December hearing.  Nor is Dr. Zhu liable for failing to transfer

9    plaintiff out of CSP-Solano as plaintiff has not demonstrated the treatment he received was

10   inadequate.

11          This court finds that no material issue is in dispute as to whether Dr. Zhu's

12   actions were the result of her "intentionally denying or delaying access to medical care." Estelle,

13   429, U.S. at 104-05.  Accordingly, Dr. Zhu is entitled to summary judgment.

14                         B.  Correctional Officers Powe and Moore

15          Plaintiff contends that C/O's Powe and Moore were deliberately indifferent to his

16   serious medical condition when they placed metal handcuffs and leg chains directly on his skin

17   when he was taken into custody at CMF, on December 18, 2003.  Pl. Dec., at ¶ 10-11.

18          When plaintiff was taken into custody at CMF, plaintiff states that he was wearing

19   a short sleeved garment and his shunts[8] and skin grafts were clearly visible, but he was not

20   wearing any type of bandages.  Pl. Dec., at ¶ 10.  Plaintiff states that metal cuffs were used on his

21   wrists and legs instead of the appropriate soft restraints that are used for his medical condition.

22   Pl. Dec., at ¶ 10.  Plaintiff states that he has never been handcuffed while at CMF.  Id.  Yet,

23   plaintiff does not have any chronos that restricts use of restraints on his hand or legs.  Depo at 49.

24

25          [8] Plaintiff describes the shunt in his arm as a tube that holds arteries inside his wrist that is
     protected by a thin and sensitive layer of skin.  Plaintiff states that metal restraints could damage
26   it, but he provides no other evidence regarding shunts.  Pl. Dec., at ¶ 6.

1        Plaintiff states that C/O Powe arrived at plaintiff's work site and put metal

2   handcuffs on plaintiff's wrists and legs that have skin grafts.  Depo at 49.  C/O Powe then

3   escorted plaintiff to the custody office and then C/O Powe left.  Depo at 53.  Plaintiff states that

4   his wrists started hurting when C/O Powe first handcuffed him.  Depo at 58.  However, plaintiff

5   did not tell C/O Powe at anytime that the metal restraints were causing pain or irritation to the

6   skin grafts.  Id.  Plaintiff did not mention that he was in pain until several hours later while at

7   CSP-Solano.[9]  Id.  Plaintiff also states that he had never spoken with C/O Powe about his

8   condition and has no evidence that C/O Powe was aware of his condition other than C/O Powe

9   visually seeing the burns and shunt.[10]  Depo at 62-64.

10       With respect to C/O Moore, plaintiff states that C/O Moore's only involvement

11   was in checking that the wrist and leg chains were secure while at CMF, just prior to plaintiff's

12   departure.  Depo at 61.  C/O Moore did not say anything to plaintiff and plaintiff states that he

13   did not say anything to C/O Moore because he was scared.  Pl. Dec., at ¶ 11.  C/O Moore's

14   involvement only lasted a few minutes and she was not present at CSP-Solano when plaintiff

15   first stated he was in pain.  Plaintiff also states that he never had contact with C/O Moore prior to

16   being taken into custody in December 2003, and he has no evidence that C/O Moore was aware

17   of his condition.  Depo at 61-62.

18       As previously noted, plaintiff had a serious medical need, so plaintiff must show

19   that the defendants' state of mind in their response to that need.  C/O's Powe and Moore were

20   clearly negligent in placing metal handcuffs on plaintiff with a shunt visible in his wrist.  A

21   reasonable person and especially C/O Powe, who had knowledge of plaintiff's condition, should

22   have known that placing metal handcuffs near a delicate medical device could be harmful; at the

23

24       [9] Plaintiff states that he was cuffed by C/O Powe in the morning and did not reach CSP-
     Solano until late afternoon.  Pl. Dec., at ¶ 10, 13.

25

26       [10] Plaintiff also wears specific clothing for his condition, that is different from traditional
     inmate uniforms.  Depo at 63.

1   very least, a reasonable correctional officer would have sought medical guidance.

2         However, plaintiff has failed to set forth facts to demonstrate that C/O's Powe and

3   Moore's actions were purposefully indifferent to his medical needs, under the more stringent

4   standard of the Eighth Amendment.  The total of C/O Moore's action involved checking that

5   plaintiff's restraints were properly fastened.  C/O  Moore had no previous knowledge of

6   plaintiff's condition and *plaintiff remained silent* concerning the irritation caused by the metal

7   restraints.  Even C/O Powe, who had knowledge of plaintiff's condition, was not deliberately

8   indifferent in merely placing restraints on plaintiff, when plaintiff remained silent and did not

9   complain of any pain until several hour later.

10         While C/O's  Powe and Moore's actions approach the threshold of the deliberate

11   indifference standard, plaintiff's silence concerning pain and discomfort prevent their actions

12   from breaching that threshold.  In viewing plaintiff's claims under this stringent standard,

13   defendants are entitled to summary judgment.

14         C.  <u>Correctional Officer Andrada</u>

15         Plaintiff contends that C/O Andrada discarded his medical supplies once plaintiff

16   was transferred to CSP-Solano, and did this with deliberate indifference to plaintiff's medical

17   condition.  Opp. at 9.

18         Plaintiff states he was told that his medical supplies at CMF would be transferred

19   to him at CSP-Solano.  Pl. Dec., at ¶ 28.  However, plaintiff later learned that C/O Andrada and

20   other prison officials disposed of the medical supplies, that included ointments, bandages and

21   jobskin stockings.

22         Plaintiff has not set forth sufficient facts to show that C/O Andrada was acting

23   with deliberate indifference to plaintiff's medical needs when these medical supplies were

24   discarded.  While C/O Andrada may have violated prison regulations there is no evidence to

25   support that he intended to harm plaintiff by not transferring the supplies.  There is no evidence

26   that C/O Andrada knew plaintiff would not receive new medical supplies at CSP-Solano.  In fact,

1   plaintiff was treated by doctors and received these supplies.  On December 19, 2003, one day

2   after the transfer, plaintiff was given ointment and TED hose.  Plaintiff disputes the usefulness of

3   TED hose but plaintiff was ordered jobskin supports on December 29, 2003. While C/O Andrada

4   may have been negligent in throwing out these medical supplies, instead of forwarding them,

5   plaintiff has failed to allege facts that C/O Andrada acted with deliberate indifference.

6          D.   Illegal Transfer

7          Plaintiff also alleges that defendants illegally transferred him to administrative

8   segregation in CSP-Solano, without due process and this transfer was permitted with deliberate

9   indifference to his medical needs.

10          The Supreme Court has held that prisoners have no constitutional right or interest

11   independently protected by the Due Process Clause to be free from discipline or placement in

12   administrative segregation.   Hewitt v. Helms, 459 U.S. 460, 468, 103 S. Ct. 864 (1983).

13   Allegations by a prisoner that he was denied due process in connection with the decision to

14   administratively segregate or discipline him present a constitutionally cognizable claim if: (1)

15   prison officials are narrowly restricted by state statutes or regulations to impose the specific

16   deprivation at play, and (2) the liberty in question is one of "real substance."  Sandin v. Conner,

17   515 U.S. 472, 477-487, 115 S.Ct. 2293 (1995).

18          Plaintiff was placed in administrative segregation so an investigation could be

19   carried out due to accusations that plaintiff extorted other prisoners.  Plaintiff was placed in

20   administrative segregation on December 18, 2003, pursuant to a narrowly restricted state statute,

21   Cal. Admin. Code. Tit. 15, § 3335.[11]  DUF #6, 8.  An ICC hearing was held on December 24,

22

23          [11] When an inmate's presence in an institution's general inmate population presents an
immediate threat to the safety of the inmate or others, endangers institution security or
24   jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity,
the inmate shall be immediately removed from general population and be placed in
25   administrative segregation.  Administrative segregation may be accomplished by confinement in
a designated segregation unit or, in an emergency, to any single cell unit capable of providing
26   secure segregation.  Cal. Admin. Code. Tit. 15, § 3335(a)

1  2003, where plaintiff had the opportunity to be heard.  DUF #11.

2          Plaintiff's placement in administrative segregation during the investigation does

3  not implicate a liberty interest of "real substance" within the meaning of <u>Sandin</u>.  A liberty

4  interest of "real substance" generally will be limited to freedom from (1) restraint that imposes

5  "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

6  life," <u>id</u>. at 484, or (2) state action that "will inevitably affect the duration of [a] sentence," <u>id</u>. at

7  487.  Here, charges were never filed and no discipline was imposed that affected plaintiff's

8  sentence.  Without more, plaintiff's placement in administrative segregation does not establish a

9  deprivation of "real substance" under <u>Sandin</u>.   In the absence of any evidence that plaintiff's

10  placement in administrative segregation amounted to a deprivation of "real substance," there is

11  no genuine issue of material fact as to the violation of his right to a liberty interest protected by

12  due process.  In fact, the ICC hearings provided plaintiff with the opportunity to address the

13  administrative segregation.

14          Plaintiff has also failed to show that the transfer to CSP-Solano occurred with

15  deliberate indifference to his serious medical needs.  Plaintiff argues that CSP-Solano was not

16  capable of meeting his medical needs.  Yet, plaintiff has provided no expert testimony and no

17  evidence to support this contention.  It is undisputed that plaintiff received medical treatment at

18  CSP-Solano.  As previously stated, plaintiff's differences of opinion concerning the appropriate

19  treatment cannot be the basis of an Eighth Amendment violation, under <u>Jackson</u>, and plaintiff's

20  disagreement with the transfer is not a cognizable claim.  Thus, defendants' motion for summary

21  judgment is granted regarding plaintiff's claims of illegal transfer.

22          E.  <u>Dr. Traquina and C/O's Pulsipher, Ruiz, Evans, Garcia and Wilkinson</u>

23          Plaintiff alleges that Dr. Traquina, chief medical officer at CSP-Solano, was

24  deliberately indifferent to plaintiff's serious medical needs even though Dr. Traquiana had no

25  direct contact with plaintiff.  Plaintiff also argues that C/O's Pulisher, Ruiz, Evans, Garcia and

26  Wilkinson (Officers)  were aware of his serious medical needs but were deliberately indifferent

1  to his medical condition by failing to try to stop the transfer to CSP-Solano.

2        Plaintiff concedes that he had no direct contact with Traquina.  Opp. at 12.

3  Plaintiff argues that circumstantial evidence exists which supports an inference that Traquina was

4  aware of his medical condition.  Opp. at 12.  Plaintiff contends that the Officers, who all work at

5  CMF, had knowledge of his medical needs and the proper treatment, and they should have voiced

6  their concerns that plaintiff's transfer was not medically proper.  Opp. at 15.

7        Because the court has found that the conduct alleged, both the transfer and the

8  medical treatment, does not state a constitutional deprivation to which plaintiff was subjected

9  these defendants are entitled to summary judgment.  Furthermore, plaintiff has failed and it

10  would be quite difficult to allege facts that correctional officers who have not attended medical

11  school are liable for failing to attempt to overrule medical orders of the prison doctors.

12  VII.  Conspiracy

13        Plaintiff alleges that the defendants entered into a conspiracy to place plaintiff into

14  administrative segregation.

15        A conspiracy claim brought under section 1983 requires proof of "'an agreement

16  or meeting of the minds to violate constitutional rights.'"  Franklin v. Fox, 312 F.3d 423, 441

17  (9th Cir.2001) (quoting United Steel Workers of Am. v. Phelps Dodge Corp., 865 F.2d 1539,

18  1540-41 (9th Cir.1989) (citation omitted)), and an actual deprivation of constitutional rights, Hart

19  v. Parks, 450 F.3d 1059, 1071 (9th Cir.2006) (quoting Woodrum v. Woodward County,

20  Oklahoma, 866 F.2d 1121, 1126 (9th Cir.1989)).  "'To be liable, each participant in the

21  conspiracy need not know the exact details of the plan, but each participant must at least share

22  the common objective of the conspiracy.'"  Franklin, 312 F.3 d at 441 (quoting United Steel

23  Workers, 865 F.2d at 1541).

24        Plaintiff claims that all defendants' actions were part of a concerted effort to place

25  him in administrative segregation.  However, he produces no evidence of an agreement between

26  them to violate his constitutional rights.  Rather, he concludes that a conspiracy was in effect

because of the fact that he was the subject of an investigation but never charged.  Plaintiff's conspiracy allegations are speculative at best with no evidence in support.  These bare allegations will not withstand a motion for summary judgment.

VIII.  <u>Respondeat Superior and Qualified Immunity</u>

Because the court has found that the conduct alleged by plaintiff does not state a constitutional deprivation, the court will not address the issues of respondent superior and qualified immunity.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for summary judgment, filed on June 23, 2008 (#95), be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 01/08/09

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:AB
wind954.sj